UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANAEL MAINE, | No. 1:17-cv-01307-AWI-JLT (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| S. SHERMAN, Warden, | **[TWENTY-ONE DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner is currently serving a life sentence in state prison for his conviction of domestic violence causing injury and torture. He has filed the instant habeas action challenging the conviction and sentence. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED**.

**I.     PROCEDURAL HISTORY**

On July 11, 2014, Petitioner was found guilty in the Kern County Superior Court of domestic violence causing injury (Cal. Penal Code § 273.5(a)), and torture (Cal. Penal Code § 206). (Doc. 1 at 1.[1]) The jury found enhancements for great bodily injury to be true. (Doc. 1 at 1.) In a bifurcated hearing, the trial court found true allegations that Petitioner had suffered three prior serious felony convictions within the meaning of California's Three Strikes law (Cal. Penal Code §§ 667(c)-(j), 1170.12(a)-(e)). People v. Maine, 2017 WL 1034683, at *1 (Cal.Ct.App.

---

[1] Page references are to ECF pagination.

1

2017).  On August 8, 2014, he was sentenced to prison for life with the possibility of parole, plus consecutive terms totaling 11 years.  Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  The Fifth DCA affirmed the judgment on March 17, 2017.  Id.  Petitioner filed a petition for review in the California Supreme Court, and the petition was summarily denied on May 24, 2017.  Id.

Petitioner next filed a habeas petition in the California Supreme Court.  (LD[2] 22.)  The petition was denied on August 30, 2017.  (LD 23.)

On October 2, 2017, Petitioner filed the instant petition for writ of habeas corpus in this Court.  (Doc. 1.)  Respondent filed an answer on December 6, 2017.  (Doc. 11.)  Petitioner filed a traverse on January 8, 2018.  (Doc. 13.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[3]:

### New Year's Day Attack

At the time of trial, six months after the incident, Kayla McKinney was 19 years old with two children from defendant, both under two years old. McKinney testified she was in a romantic relationship with defendant for three years and still loved him. On December 31, 2013, McKinney was drinking from a half gallon bottle of Captain Morgan rum at her kitchen table with defendant, her sister Karissa, Karissa's friend Allie, and McKinney's friends Clay and Brandy.

McKinney stated she did not recall anything else from that evening except waking up the next day at 9:00 a.m. in her parents' house. When she awoke, McKinney had a black eye, which she could not open for about six hours, and her eye and head were in pain. McKinney's eye took days to heal. Her lip remained swollen for another day. McKinney testified she did not recall how she received her injuries. McKinney said she remembered nothing from New Year's Eve and did not remember telling her mother what had happened. McKinney denied making statements to sheriff's deputies about the incident.

About a week after the incident, McKinney talked to a social worker from child protective services. The social worker was looking at the injury to McKinney's eye. McKinney told the social worker she did not know what had happened, though McKinney admitted she and defendant were involved in domestic violence on New Year's Eve. The social worker told McKinney she knew what had happened and advised McKinney to get a restraining order on defendant or

---

[2] "LD" refers to the documents lodged by Respondent with his answer.
[3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

McKinney's children would be taken from her. McKinney denied making specific statements about the incident to the social worker.

McKinney told the social worker she had had a food fight with defendant at their home in March 2013. In retaliation, defendant threw a perfume bottle at McKinney, hitting her in the left cheek. McKinney's mother came over and took McKinney to her home where she called the sheriff's office because McKinney had asked her to do so. McKinney talked to a deputy about the incident. Defendant had stomped on McKinney's pinky toe and she showed deputies the injury.

A few days after the New Year's Day incident, McKinney filled out an application for a protective order prepared by someone from the Family Alliance who had read the deputies' report of the incident. McKinney obtained a protective order against defendant. Three recorded phone conversations McKinney had with defendant in January 2014 were played for the jury. McKinney admitted she visited defendant in January 2014 and several times since then. Defendant's parents visited McKinney. McKinney said she did not want defendant prosecuted for what happened on New Year's Eve and January 1, 2014, because she still loved defendant and wanted him to come home.

On New Year's Eve 2013 and New Year's Day 2014, Kimberly Harvey lived next door to McKinney and defendant. McKinney's bathroom window was five feet from Harvey's front door. Harvey was awakened by her daughter who heard a woman screaming for help from the residence next door. Harvey recognized McKinney's voice because their children played together. Harvey heard McKinney screaming "Stop. Stop. Help." Harvey also heard defendant yelling at McKinney and calling her "slut, bitch, whore." Harvey heard defendant repeatedly hitting and slapping McKinney for 30 minutes.

Because she did not have a phone, Harvey could not immediately intervene, but she got to a phone 30 minutes later and called 911. The recording of Harvey's 911 call was played to the jury. When deputies arrived and talked to Harvey, Harvey heard defendant slap McKinney again. Defendant was arrested. McKinney told Harvey once that defendant was very physically and mentally abusive to her. McKinney thanked Harvey for saving her life because defendant would have killed her. After Harvey was subpoenaed to testify at trial, McKinney told her not to come to court. Harvey was convicted twice for theft in 2014.

Kern County Deputy Sheriff Eric Hughes was dispatched with Deputies John Puga and David Rutter to McKinney's home at 3:00 a.m. on January 1, 2014. Hughes announced his presence, knocked on the door, and saw defendant walking down the hallway. Hughes could see defendant peeking out the blinds and run down the hallway before coming back a minute and a half later and opening the door eight or nine inches. Hughes explained he was investigating a domestic disturbance. Defendant told Hughes McKinney and their children were asleep. Hughes, however, saw blood on defendant's hand and realized he needed to make entry to check on the welfare of the other inhabitants. Hughes pushed the door open and ordered defendant to sit on a couch.

McKinney stepped out of the bathroom. Her face had blood running down it, her lip was busted, and her eye was swollen. McKinney was distraught and crying. Her pants were down around her ankles. McKinney told Hughes defendant had beaten her. She was transported to the hospital.

The jury was shown photographs taken by Deputy Puga the evening of the incident

depicting the extent of McKinney's injuries. Puga explained that when he went towards the bathroom to check on McKinney, she reached out to grab his hand. McKinney's lips were swollen and bleeding, her eyes were swollen shut, her face was bloody, and she was crying. McKinney told Puga she was afraid that if she did not get up from the floor, the deputies would leave and defendant would come back and continue beating her. McKinney was afraid for her life. Puga did not believe McKinney was intoxicated and saw no symptoms of her being under the influence of an alcoholic beverage.

Puga followed McKinney to the hospital where she was able to answer his questions without hesitation. McKinney told Puga defendant had a prior domestic violence incident in which she was the victim about a year earlier. McKinney explained defendant got together with friends at a New Year's Eve party, had several alcoholic beverages, accused McKinney of cheating on him, and started hitting her. McKinney screamed and pled for defendant to stop. At one point during defendant's attack, McKinney lost consciousness when defendant kicked her in the face.

McKinney was treated at the hospital by a physician's assistant. She suffered from a contusion and abrasion along her face on the right superior orbit, resulting in a hematoma. McKinney complained of a head injury and loss of consciousness.

At defendant's and McKinney's residence, Hughes noticed the bathroom and bedroom doors had large holes in them. The frame of the bathroom door was cracked. Both Hughes and Puga believed someone tried to kick the doors open.

Social worker Debra Vallejo with the Kern County Department of Human Services was assigned to McKinney's case. Vallejo contacted McKinney on January 7, 2014, and observed an injury to McKinney's eye that included swelling and broken blood vessels in the eye itself. The skin underneath the eye was yellow. McKinney told Vallejo she and defendant had been partying on New Year's Eve and got into a physical altercation when they got home. Defendant broke down the bathroom door and hit McKinney several times. Defendant pulled McKinney by the hair onto the bathroom floor, kicking her head and her body.

**Prior Assault of Juan Rocha**

Pursuant to Evidence Code section 1101, subdivision (b), evidence was admitted through the testimony of Clay Dalton that on June 14, 2009, Dalton and defendant were outside a 7–Eleven when Juan Rocha asked them for change. Dalton and defendant told him no. Rocha asked for a cigarette and was again told no. Rocha became angry and walked toward defendant and Dalton and took a swing at them. Defendant swung back and began fighting with Rocha. The two combatants landed on the ground and continued fighting. Two women came out of a car with a bat but stopped approaching defendant when a sheriff's deputy arrived.

Sheriff's Deputy Marcus Moncur testified he was a deputy on patrol and observed a fight on June 14, 2009, in front of a 7–Eleven. Moncur saw Rocha flat on the ground with defendant in a standing position pull his leg up and dropping it into Rocha with his full body weight. Moncur never saw defendant on the ground struggling with Rocha. Defendant dropped his weight on Rocha using his knee three or four times. Two females had exited their vehicle carrying a tire iron and were yelling at defendant.

Dalton told Deputy Moncur Rocha was "talking shit" to defendant and defendant

probably started fighting because Rocha was Mexican. Rocha's lip was cut and swollen. Rocha was wearing gauges, or big circles in his earlobes. A gauge was missing in one ear and the skin connecting to the earlobe was ripped open. Defendant was a juvenile, under the influence of alcohol, and was arrested by Moncur.

**Prior Assault of McKinney**

Pursuant to Evidence Code section 1101, subdivision (b), evidence was admitted from the testimony of sheriff's deputy Ryan Pitcher that on March 30, 2013, Pitcher spoke to McKinney. McKinney told Pitcher she and defendant had been drinking alcohol when McKinney thought they had had too much to drink and began to pour a bottle of alcohol down the sink. Defendant became angry. Defendant tried taking the bottle from McKinney and stomped on her pinky toe. Defendant hit McKinney in the face and pushed her as he was trying to take the bottle out of McKinney's hand. When McKinney tried to call her mother, defendant punched her in the face and threw hair care products at her. Pitcher photographed the injuries defendant inflicted on McKinney.

**Expert Opinion Testimony**

Nada Yorke is a licensed clinical social worker who owns Yorke Consulting and Correctional Counseling for Change, a batterer intervention program for people ordered or self-referred to a 52–week domestic violence program. Yorke was also a probation officer for 24 years and has a bachelor degree in psychology and criminal justice and a master degree in social work. Yorke has testified as an expert witness in intimate partner violence in criminal and civil court.

Yorke explained domestic violence involves a pattern of coercive, controlling behavior designed to control a partner. Most perpetrators do not consider themselves to be violent. Relationships often start with intense, powerful feelings. When people have not learned how to deal with conflict in a healthy way, it starts with verbal abuse and then escalates into violence. Victims can recant allegations of domestic violence when the case gets into the criminal justice system. Sometimes victims will explain away the abuse to prevent a partner from being arrested. Some of the reasons for recanting an allegation of abuse include a sense of guilt, a feeling by the victim that he or she initiated the assault, and the common occurrence of the victim taking personal responsibility for being assaulted.

Often the victim is concerned the partner will receive a lengthy prison sentence and the victim concludes that despite very serious injuries, the sentence is disproportionate to the injuries. Victims can feel enough embarrassment that they do not want to share the abuse they suffered with family members, and the fear the violence from the partner will get worse if an incident is reported.

**Defense Evidence**

McKinney's older sister Karissa Thompson testified she picked up McKinney on New Year's Eve 2013, and they went out to be with friends. Thompson said McKinney cannot handle alcohol very well and was "get[ting] crazy," so Thompson took her home. Though McKinney does not drink alcohol very often, when she does drink, she is overindulgent. McKinney was irritated when Thompson brought her home. McKinney was acting out by yelling at people and falling on the ground. She was also hitting her face and head. Thompson supports McKinney's relationship with defendant. When McKinney was back home, she

was hurting her face in the bathroom. According to Thompson, defendant was trying to calm down McKinney and did not lay a hand on her.

Rachelle Perez, McKinney's mother, testified McKinney does not have a drinking problem but does not handle alcohol well. Perez also explained McKinney has a mental health issue. When she was 13 or 14 years old, McKinney tried to hurt herself a lot and received counseling. McKinney would bang her head on the wall and the ground. Once she had four or five knots on her head and caused herself to have two black eyes. Perez was not present at the New Year's Eve party.

Defendant testified lies had been told about him at trial. McKinney had been his girlfriend for three years and was now his fiancée. Defendant said that during the 7–Eleven incident, he was 17 years old. He was with his father and Dalton smoking a cigarette outside the store when Rocha asked for a cigarette and money. When defendant and Dalton told him no, Rocha said in Spanish what defendant interpreted to mean "suck my dick." To defendant, these were fighting words and he felt threatened by Rocha. Defendant denied hating people of Mexican ancestry. The fight happened very fast and a sheriff's deputy showed up. Defendant had a packet with marijuana in it. He went to prison and had convictions for theft and making a "beer run" with theft prior convictions.

Defendant saw McKinney hurt herself. Once she tried to cut herself with a knife. McKinney reported defendant was responsible for the knife incident, but it was a false report of domestic violence. Defendant described McKinney as the love of his life, but said she drank too much and had mental health issues. Defendant said McKinney hurt her head 20 times in the past and he witnessed 12 or 15 of those events. During the food fight episode, it was McKinney who accused defendant of cheating on her and she was the one yelling at him. Defendant did not hit McKinney but only threw food back at her. McKinney threw a half empty bottle of a hair care product at defendant. He tossed it back at McKinney but did not throw it at her. During the incident, McKinney stubbed her toe and blamed defendant.

On New Year's Eve, defendant and McKinney were having a good time. She had recently given birth to their second child and was recovering. They invited Dalton, his girlfriend, and Thompson to their home. Defendant was drinking beer and smoking cigarettes while McKinney and her friends drank shots from a half gallon of Captain Morgan rum. Around 7:30 p.m., the three women decided to go to a party. Defendant and Dalton stayed behind but eventually took four beers with them and walked to Dalton's residence. Defendant said he was not drunk.

Just before midnight, defendant, without Dalton, walked over to the party the women attended. Defendant talked to McKinney but did not drink. McKinney was drinking rum and whiskey and became "sloshy." McKinney asked for defendant's wallet and house keys so she could go buy alcohol. It was about midnight. McKinney came back from the party being supported by Thompson as they walked. Defendant described McKinney as falling down drunk. McKinney suffered a fall outside their residence.

Defendant said he heard a metal chair screeching in the kitchen and then a "boom, boom, boom, like somebody hitting the table." He heard McKinney speaking to Thompson, accusing defendant of breaking her cell phone. When he went inside, he found McKinney on the ground. She had fallen and hit her head. Defendant said he heard McKinney and her sister "starting to get into it" and "bumping heads." Although Thompson was trying to hold McKinney, McKinney fell and hit her head on the wall of the residence. McKinney injured her right eye.

According to defendant, McKinney went to the bathroom by herself. Defendant heard a noise. McKinney had hit herself falling again. Defendant could hear Thompson "[s]creaming like bloody murder, stop, stop." It was about 3:00 a.m. Defendant said he heard McKinney grabbing at the counter and a metal towel rack when she slipped again and hit the plastic bathtub. McKinney was bleeding from her nose. Defendant did not hit McKinney's face. Thompson closed the bathroom door because McKinney still needed to urinate and Thompson left.

Defendant explained he took off his shirt to get ready for bed when he heard another bang. He went to the bathroom, but the door was locked. Defendant yelled to McKinney to find out what happened but she did not respond. Defendant kicked a hole in the door and then reached his hand through the hole to open it. McKinney was bloody, lying on the ground, and her pants were not around her ankles. There was a knock on the door that turned out to be from the sheriff's deputies.

Defendant denied an adjudication he had when he was 13 years old for an assault causing serious bodily injury, offering an alternative explanation of events. Defendant admitted committing a prior vandalism, denying he committed a robbery. When asked if he was prosecuted for assaulting and trying to steal cigarettes from a 7–Eleven clerk, defendant said he just smashed the window of the store and did time for attempted robbery. Defendant denied his conviction in 2009 for robbery was anything more than committing a petty theft with prior convictions. Defendant then admitted he pled no contest to robbery. Defendant conceded he was served with a restraining order prohibiting him from contacting McKinney shortly after the New Year's incident.

Maine, 2017 WL 1034683, at *1–5.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's

1    factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

2    among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

3    1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

4         To determine whether habeas relief is available under § 2254(d), the federal court looks to

5    the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

6    Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

7    2004).  "[A]lthough we independently review the record, we still defer to the state court's

8    ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

9         The prejudicial impact of any constitutional error is assessed by asking whether the error

10   had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

11   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

12   (holding that the Brecht standard applies whether or not the state court recognized the error and

13   reviewed it for harmlessness).

14        C.    Review of Claims

15        The instant petition presents the following grounds for relief: 1) Petitioner was denied the

16   effective assistance of trial and appellate counsel; 2) The conviction was secured by the

17   prosecutor threatening the victim with charges and taking the children in protective custody

18   unless the victim testified falsely; 3) The use of extrajudicial statements of the victim contrary to

19   her trial testimony was insufficient to sustain the conviction; 4) The trial court erred in admitting

20   into evidence a 2009 beating incident in order to show Petitioner acted with a sadistic purpose

21   when he struck the victim; 5) The prosecutor committed misconduct in closing arguments by

22   posting a quotation about sadism from the philosopher Eric Fromm which resulted in the

23   presentation of new evidence to the jury; 6) The cumulative impact of the errors compels a

24   reversal; and 7) The federal court should independently review sealed records of the closed

25   hearing held in response to the defense's Pitchess motion to determine if any discoverable

26   information was not disclosed.

27        1.    Ineffective Assistance of Counsel

28        In his first claim for relief, Petitioner alleges he received ineffective assistance from trial

9

counsel and appellate counsel in the following ways: 1) Trial counsel was not granted reciprocal discovery time; 2) Trial counsel failed to call eyewitness G. McElroy who could confirm the victim had self-inflicted injuries; 3) Trial counsel failed to secure the mental health record of the victim which would have demonstrated that the victim had a history of self-inflicting injuries; 4) Trial and appellate counsels failed to present the ground that admitting the inconsistent statements of the victim tainted the entire trial.

a. Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v.

10

Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

In addition, the Strickland standard applies to trial counsel and to appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2002).  Appellate counsel is under no duty to raise every non-frivolous issue requested by the petitioner.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  Appellate counsel has wide latitude in selecting which arguments should be raised on appeal.  Id. at 751-52.

b.  Analysis – Reciprocal Discovery Time

Petitioner first claims defense counsel was ineffective because he was not granted reciprocal discovery time.  This claim is without merit for several reasons.  To begin, the amount of time given to defense counsel for discovery was a trial court decision.  Defense counsel had no control over the amount of time provided by the trial court.  Therefore, he cannot be faulted for the amount of time he was provided.  Moreover, the claim is completely conclusory.  Petitioner fails to state why additional discovery time was needed.  There is no indication that defense counsel was not prepared for the trial, and Petitioner does not state what additional discovery would have been obtained had more time been granted.  For these reasons, Petitioner fails to show that counsel erred or that the alleged error resulted in any prejudice.

c.  Analysis – Witness G. McElroy

Petitioner next claims defense counsel rendered ineffective assistance by failing to call witness G. McElroy, who he claims would have testified that the victim had self-inflicted the injuries she sustained. This claim is also without merit.  Defense counsel presented substantial evidence that the victim had self-inflicted some of her wounds.  Defense counsel elicited testimony from the victim's sister, Karissa Thompson, that on the night in question the victim

was drunk and had fallen down on the walk home hitting the ground and other things. (RT 776.)

She further testified that once the victim arrived at home, she continued to hit her head on

everything, her face against things, and hit her hands against the walls. (RT 775-76.) She also

testified that the victim had hurt herself on many previous occasions. (RT 783.) Defense counsel

also called the victim's mother who testified that the victim had previously hurt herself on four or

five occasions prior to the incident. (RT 1233.) She stated that the victim would drink and then

hurt herself by banging her head against the wall and on the ground causing bruising and black

eyes. (RT 1234.)

As to alleged witness G. McElroy, there is no indication that he would have testified as

Petitioner represents. Petitioner's claim that his testimony would have been helpful is pure

speculation. Moreover, in light of the testimony elicited from more important witnesses,

McElroy's testimony would have been merely cumulative. As Respondent correctly notes,

"defense counsel's 'decision not to seek more' mitigating evidence . . . 'than was already in hand'

fell 'well within the range of professionally reasonable judgments.'" Bobby v. Van Hook, 558

U.S. 4, 11-12 (2009).

 d.  Analysis – Mental Health Records

Petitioner next claims counsel was ineffective in failing to secure the mental health

records of the victim. He alleges these medical records would have demonstrated that the alleged

victim had a history of self-inflicting injuries. This claim is purely speculative. There is no

indication that any mental health records existed, and there is certainly no showing that these

health records would have been helpful to the defense. Furthermore, as Respondent correctly

notes, the victim's mother testified that the victim had tried to harm herself when she was 13 or

14 years old, and the victim had received counseling treatment as a result. (RT 1234.) The

counseling treatment ended when the family's Medi-Cal aid ended. (RT 1234.) There is no

indication that these counseling treatments resulted in the creation and availability of any mental

health records. Even if mental health records existed from when the victim was 13 or 14, they

were irrelevant and cumulative to the evidence actually presented by the defense. As previously

stated, the victim's mother and sister both testified to the pattern of self-inflicting harm

12

1    demonstrated by the victim in the past.

2         e.   <u>Analysis – Admission of Inconsistent Statement</u>

3       Petitioner next claims trial counsel and appellate counsel were ineffective in failing to

4 argue that the admission of the inconsistent statements of the victim tainted the trial.

5       Petitioner fails to state precisely how trial counsel and appellate counsel erred.

6 Presumably, Petitioner is arguing that trial counsel should have objected to the introduction of the

7 victim's statements made to law enforcement and medical personnel shortly after the incident,

8 because those statements were contradicted by the victim's testimony at trial.  However,

9 Petitioner fails to establish any basis for this argument.  California Evidence Code section 1235

10 authorizes the admission into evidence of a witness's prior inconsistent statement.  It was for the

11 jury to decide which statements made by the victim were true.

12       Likewise, Petitioner fails to establish any error on the part of appellate counsel concerning

13 the victim's prior statements.  Trial counsel did not object to the admission of the prior

14 inconsistent statements.  Under California law, the argument was waived for purposes of appeal.

15 <u>See</u> Cal. Evid. Code § 353.  Thus, there was no argument for appellate counsel to make.

16 Moreover, any objection by trial counsel would have been denied pursuant to Cal. Evid. Code §

17 1235.

18       2.   <u>Prosecutorial Coercion</u>

19       Petitioner next claims that the conviction was secured by the prosecutor threatening the

20 victim that Child Protective Services would take the children if she refused to testify against

21 Petitioner.  This claim was raised and rejected by the California Supreme Court in Petitioner's

22 habeas action.

23       The claim fails for several reasons.  To begin, Petitioner alleges the prosecutor coerced the

24 victim's statement by threatening to take the children away; this is simply not true.  There is no

25 evidence that the prosecutor threatened the victim in any way.  The record shows that the alleged

26 threat came from a CPS worker investigating the case.  The victim testified that a CPS worker

27 contacted her approximately one week after the incident.  (RT 665.)  When the CPS worker asked

28 the victim about her injuries and the events on the night of the incident, the victim stated she

didn't remember what happened. (RT 667.) The CPS worker advised the victim that she knew what Petitioner had done to her that night, and that if the victim didn't obtain a restraining order against Petitioner, then CPS would take the kids away. (RT 668.) When the victim advised the CPS worker that she didn't remember what happened so as to request a restraining order, the CPS worker told her to utilize the police report since she had no present recollection. (RT 668.) Subsequently, a worker from the Family Alliance filled out a request for restraining order based on the information contained in the police report, and the victim signed it. (RT 678.) Therefore, the record shows that the victim was allegedly threatened to seek a restraining order by the CPS worker, and the prosecution had no involvement.

Assuming that Petitioner is complaining that the victim was forced to give a false version of the facts in order to obtain a restraining order and the prosecutor used this version at trial, the claim still fails. Debra Vallejo was the CPS worker assigned to the victim's case. (RT 1028.) On December 30, 2013, Vallejo made contact with the victim. (RT 1031.) She made a second contact with her on January 7, 2014. (RT 1031.) During the second contact, Vallejo noticed the victim had injuries to her eye: her right eyelid was swollen and reddish; there were what appeared to be broken blood vessels in her eye; and the skin under her right eye was yellowish in color. (RT 1031-32.) Vallejo asked the victim what had happened to her. (RT 1032.) The victim told Vallejo that she and the petitioner had gotten into a physical altercation on New Year's Eve when they returned home from partying. (RT 1033.) The victim stated that Petitioner had hit her several times. (RT 1033.) Specifically, she stated that Petitioner had kicked in the bathroom door while the victim was in the bathroom and proceeded to pull her by the hair off the toilet; he then kicked her head and body multiple times while the victim was on the floor. (RT 1033.) The victim stated that she feared for her life and thought she was going to die. (RT 1033.) Vallejo advised the victim that she needed to protect her children. (RT 1034.) The victim stated that she believed there was still a no-contact order in existence from the previous incident. (RT 1034.) Vallejo advised her to follow the current order that was already in place. (RT 1035.) She further advised the victim that it would be helpful for her to utilize the police report for her own reference and for future reference. (RT 1035.) Vallejo testified that she never threatened to take

14

the kids away.  (RT 1040-41.)

a.  <u>Legal Standard</u>

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).  So must a conviction obtained by the presentation of false evidence.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678-80 nns.8-9 (1985).  In <u>Napue</u>, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared.  <u>Id</u>. at 269.  The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty."  <u>Id</u>.  In order to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material."  <u>United States v. Zuno–Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003), <i>cert. denied</i>, 540 U.S. 1208 (2004).  Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.  <u>United States v. Zuno-Arce</u>, 44 F.3d 1420, 1423 (9th Cir.1995).  "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."  <u>Id</u>.

b.  <u>Analysis</u>

The claim fails because there is no showing that the prosecutor knew or should have known that the victim's prior statements were false.  Moreover, there is no showing that the victim's prior statements were false.  In any case, the victim's prior inconsistent statements, her different version at trial, and her allegation that her prior statements were coerced were fully before the jury.  It was for the jury to determine which version provided by the victim was true.  Therefore, a fairminded jurist could determine that Petitioner's constitutional rights were not violated.  <u>See</u> <u>United States v. Houston</u>, 648 F.3d 806, 814 (9th Cir. 2011) (The inconsistent

15

statements "were fully explored and argued to the jury. Beyond this, no record was developed about the government's use of perjured testimony. This leaves no basis upon which to conclude that [] perjured testimony [was] knowingly used."). For these reasons, the claim should be rejected.

### 3. Insufficient Evidence

Petitioner contends that the evidence was insufficient to support the conviction. He alleges that the victim's statements to law enforcement and medical personnel were inconsistent with the victim's trial testimony and were therefore insufficient to support the guilty verdict. This claim was raised and rejected by the California Supreme Court in Petitioner's habeas action.

### a. Legal Standard

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

16

1    477 U.S. 436, 459 (1986).

2         In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further

3    explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

4         makes clear that it is the responsibility of the jury - not the court - to decide what
             conclusions should be drawn from evidence admitted at trial. A reviewing court
5            may set aside the jury's verdict on the ground of insufficient evidence only if no
             rational trier of fact could have agreed with the jury. What is more, a federal court
6            may not overturn a state court decision rejecting a sufficiency of the evidence
             challenge simply because the federal court disagrees with the state court. The
7            federal court instead may do so only if the state court decision was "objectively
             unreasonable."
8
             Because rational people can sometimes disagree, the inevitable consequence of
9            this settled law is that judges will sometimes encounter convictions that they
             believe to be mistaken, but that they must nonetheless uphold.
10

11   Id. at 2.

12        b.    Analysis

13        Petitioner fails to make a showing that the state court rejection of his claim was contrary

14   to or an unreasonable application of Supreme Court authority, or was an unreasonable

15   determination of the facts.  Petitioner merely disagrees with the outcome of the trial.

16        At trial, the victim testified that she did not remember what occurred on the night in

17   question.  (RT 655, 658.)  She testified that she did not recall how she sustained her injuries.  (RT

18   657-658.)  She stated she did not recall speaking with her mother, medical personnel or law

19   enforcement personnel on the night in question.  (RT 657-58.)  Thus, the victim did not state that

20   Petitioner did not commit a brutal assault on her; she stated only that she did not recall the events.

21   In contrast to her trial testimony, the statements she made to Deputies Eric Hughes, John Puga,

22   and Physician's Assistant Christopher Juden immediately after the incident were detailed and

23   consistent with all other evidence.  (RT 895, 936, 940, 1108-15.)  In those statements, the victim

24   readily stated that Petitioner had brutally beaten her.  (RT 940, 944-47.)  The deputies' and

25   physician's assistant's trial testimony was corroborated by the extensive and severe injuries

26   sustained by the victim.  (RT 893, 934-36, 1111-1115.)  Also, Deputy Hughes witnessed blood on

27   Petitioner's hand when he answered the door.  (RT 893.)  The victim's apartment was in a

28   physical state consistent with the victim's statement.  (RT 895-96, 955-56.)  In light of the

17

evidence, there is no question that the jury believed the testimony of law enforcement and medical personnel. Petitioner fails to establish that the state court rejection of the claim was an unreasonable application of Supreme Court authority. The claim should be denied.

4. <u>Admission of Evidence</u>

Petitioner next claims that the trial court erred by admitting into evidence a 2009 incident in order to show the petitioner's sadistic purpose in beating the victim. Petitioner presented this claim on direct appeal, and it was denied by the appellate court in the last reasoned decision, as follows:

**Issues**

Defendant contends the trial court erred in ruling during in limine motions that the prosecution could present evidence pursuant to Evidence Code section 1101, subdivision (b) concerning the assault of Rocha in 2009. The trial court found the evidence was relevant to show defendant's intent. Defendant argues the prosecution tried to establish defendant was a bigot who did not like people with Mexican heritage, and the evidence only showed defendant's propensity to commit violent acts. Defendant contends the evidence should have been excluded pursuant to Evidence Code section 352 because its probative value was overcome by its unduly prejudicial nature.

The People respond the challenged evidence established defendant's intent to torture McKinney as alleged in count 2, and the assault of Rocha had similar characteristics. The People argue the admission of the evidence was harmless even if it should have been excluded. Defendant replies that because he denied hurting McKinney, he did not place the issue of his intent before the jury. We find that even if defendant's intent was not a proper basis under Evidence Code section 1101, subdivision (b) for the admission of the 2009 incident, the evidence was still admissible to show the absence of an accident, which was the central theme to the defense at trial.

**Admissibility of 2009 Incident**

Evidence Code section 1101 prohibits admission of evidence of a person's character, including specific instances of uncharged misconduct, to prove the conduct of the person on a particular occasion. Subdivision (b) of Evidence Code section 1101 clarifies that this prohibition does not apply to admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition. [FN2.] (*People v. Fuiava* (2012) 53 Cal.4th 622, 667; *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).)

> [FN2.] Subdivision (b) of Evidence Code section 1101 provides in relevant part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, ...) other than his or her disposition to commit such an act."

18

Evidence a defendant committed crimes other than those he or she is currently charged with is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue such as motive, intent, preparation, or identity. The trial court has the discretion to admit such evidence after weighing its probative value against the prejudicial effect pursuant to Evidence Code section 352. In reviewing the admissibility of other crimes evidence, a court must consider (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crimes evidence to prove or disprove a fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant, because this type of evidence can be damaging. (*People v. Fuiava, supra*, 53 Cal.4th at p. 667.)

A trial court's ruling on the relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352 is reviewed under the abuse of discretion standard. (*People v. Scott* (2011) 52 Cal.4th 452, 491; *People v. Fuiava, supra*, 53 Cal.4th at pp. 667–668.) We further review the evidence in the light most favorable to the trial court's ruling. (*People v. Edwards* (2013) 57 Cal.4th 658, 711.) The trial court's exercise of discretion will not be set aside unless it is so arbitrary, capricious, or patently absurd that it results in a miscarriage of justice. (*People v. Ochoa* (2001) 26 Cal.4th 398, 437–438, abrogated on another ground as noted in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.)

For other-crimes evidence to be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses. The pattern and characteristics must be so unusual and distinctive as to be like a signature. (*People v. Kipp* (1998) 18 Cal.4th 349, 369–370; Ewoldt, supra, 7 Cal.4th at p. 403.) A lesser degree of similarity is required to establish relevance on the issue of common design or plan. The common features between the charged and uncharged crimes must indicate the existence of a plan rather than a series of similar spontaneous acts. The plan need not be distinctive. The least degree of similarity is required to establish relevance on the issue of intent. For this purpose, the uncharged crimes need only be sufficiently similar to the current alleged offenses to support an inference the defendant probably harbored the same intent in each incident. (*Kipp, supra*, at p. 371; *Ewoldt, supra*, at pp. 402–403.)

In proving intent, the act is conceded or assumed. What is sought is the state of mind that accompanied it. (*Ewoldt, supra*, 7 Cal.4th at p. 394, fn. 2; *People v. King* (2010) 183 Cal.App.4th 1281, 1301 (*King*).) When Evidence Code section 1101 was enacted in 1965, it was meant to codify existing law, including, specifically, common scheme or plan, preparation, motive, intent, knowledge, identity, or the absence of mistake or accident. (*Ewoldt, supra*, at pp. 399–400; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1375.) In *Spector*, the defendant tried to show the victim of homicide had committed suicide, which then made other-crimes evidence admissible to prove the cause of the victim's death was neither an accident nor a suicide. (*Spector, supra*, at pp. 1376–1377.)

The parties devote most of their argument to whether it was permissible for the prosecutor to prove defendant's intent when defendant denied the allegations. Because the least degree of similarity in the charged and uncharged crimes is necessary to show intent, we find no abuse of discretion in the trial court's ruling finding the 2009 incident to be admissible. In his reply brief, however, defendant argues his denial of the allegations did not make his intent relevant, citing the *King* case.

In *King*, the defendant was charged with sexual crimes, and the prosecution brought into evidence an uncharged act to prove intent under Evidence Code

section 1101, subdivision (b). The court in *King* found the evidence inadmissible because in proving intent, the act is conceded with the goal of establishing the state of mind that accompanied intent. Because the defendant was challenging the allegations, they were not conceded and his intent was not at issue. (*King, supra*, 183 Cal.App.4th at pp. 1300–1301, citing *Ewoldt, supra*, 7 Cal.4th at p. 394, fn. 2.) The decision in *King* relied on a civil case, *Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 919–923.)

The decision in *King* announced a very sweeping rule based on a cryptic statement in a footnote of the *Ewoldt* opinion, and a civil case in which the plaintiff does not bear the burden of proof beyond a reasonable doubt as do the People in a criminal action. Even if we assume *King* is a proper statement of law and the 2009 assault of Rocha was not admissible to prove defendant's intent, the other-crimes evidence was admissible to disprove the defense that McKinney harmed herself by her own drunkenness. The defendant in *Spector* attempted to prove the victim committed suicide, opening the door for the prosecution to establish other uncharged crimes committed by the defendant to show the absence of mistake or accident. (*People v. Spector, supra*, 194 Cal.App.4th at pp. 1376–1377.)

The entire defense focused on McKinney's alleged mental health issues and her behavior when drinking alcohol. By defendant's account, McKinney fell, hitting herself, before she came home, just before she entered the home, on multiple occasions in the house, and while she was supposedly locked in the bathroom. Defendant not only tried to establish this through his own testimony, but through the testimony of McKinney's mother and sister. If the 2009 assault was inadmissible to show defendant's intent to torture McKinney, it was admissible to show the absence of mistake or accident by the victim. Assuming arguendo that the trial court incorrectly admitted the other-crimes evidence for the wrong reason, if the trial court issues a ruling reaching the correct result but for the wrong given reason, the ruling will not be disturbed on appeal. (*Rivero v. Superior Court* (1997) 54 Cal.App.4th 1048, 1054, citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)

**Evidence Code section 352**

After finding the 2009 incident admissible under Evidence Code section 1101, subdivision (b), the court further found the prejudicial effect of admitting the evidence did not outweigh its probative value. Defendant argues to the contrary.

After determining that defendant's prior conviction was relevant and admissible under Evidence Code section 1101, the trial court must then determine whether the evidence was made inadmissible by Evidence Code section 352. A court has discretion to exclude relevant evidence pursuant to Evidence Code section 352 if its admission would necessitate an undue consumption of time or create substantial danger of undue prejudice, confuse the issues, or mislead the jury. The prejudice referred to in Evidence Code section 352 applies to evidence uniquely tending to evoke an emotional bias against the defendant as an individual and has very little effect on the issues. In applying Evidence Code section 352, prejudicial evidence is not made inadmissible because it is damaging. Prejudicial evidence is not synonymous with damaging evidence. The relevant factors for determining prejudice are whether the prior acts were more inflammatory than the charged conduct, the possibility the jury might confuse the prior acts with the charged acts, whether the prior acts were more recent or remote in time, and whether the defendant had already been convicted and punished for the prior offenses. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

The People argue that the extreme violence of defendant's conduct on both victims, especially after they were rendered helpless by defendant's own violence, coupled with little or no provocation by either victim, showed defendant harbored a sadistic purpose to torture McKinney. The beating of Rocha was intense, though brief, compared to defendant's prolonged beating of McKinney. A gauge in Rocha's ear was pulled out, damaging his ear. Moncur witnessed defendant kicking and punching Rocha when Rocha was already on the ground and unable to continue fighting defendant.

Defendant argues the admission of this evidence was particularly prejudicial because of the implication defendant was a bigot who hated people with Mexican heritage. It was Dalton, however, who introduced this point in a statement he made to Moncur immediately after the incident. Dalton's main point regarding the incident was that Rocha angered defendant by verbally provoking him and then moving in on defendant and taking a swing at him after defendant and Dalton refused to give him money or cigarettes.

Although there are similarities between defendant's attack of Rocha and McKinney, defendant's assault of Rocha was not as bad as his assault on McKinney. The greatest difference between the two episodes is that defendant's assault on McKinney lasted so long, at least 30 minutes. The 2009 assault happened over a much shorter time. Because the attack on McKinney was longer and far more intense, there would be less prejudicial impact on the jury hearing testimony about the 2009 incident. The probative value of defendant's assault of Rocha is important because it shows the ferocity of defendant's temper when he faces little or no provocation. The trial court did not err in finding evidence of the 2009 assault admissible under Evidence Code section 352.

**Harmless Error**

Defendant asserts the admission of the other-crimes evidence was so prejudicial it caused his trial to be fundamentally unfair so as to violate his right to due process. The People respond that even if the other-crimes evidence was erroneously admitted, any error was harmless. We agree with the People.

When evidence is admitted in violation of Evidence Code section 1101, it is not always prejudicial error. Pursuant to *People v. Watson* (1956) 46 Cal.2d 818, 836, it must be reasonably probable that a result more favorable to the defendant would have resulted absent admission of the evidence. (*People v. Welch* (1999) 20 Cal.4th 701, 749–750; *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 755.)

The jury was instructed with CALCRIM No. 303 that when evidence is admitted for a limited purpose, the jury must consider it for the limited purpose and for no other. The jury was also instructed on other-crimes evidence with CALCRIM No. 375, which explained the People have to prove an uncharged act by a preponderance of the evidence. It also instructed the jury it had to evaluate the evidence for its similarity, or lack of similarity, to the charged offenses and the uncharged crime evidence could not be used for any other purpose, including defendant's bad character or disposition to commit crime. Jurors are presumed to understand and follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Holt* (1997) 15 Cal.4th 619, 662; *People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502.)

In addition to the limiting instructions given by the court concerning how the jury could evaluate evidence of defendant's 2009 assault, the evidence defendant

21

tortured McKinney without provocation was strong. McKinney's neighbor Harvey heard McKinney being hit and slapped by defendant for 30 minutes before she could reach a phone and call the authorities for help. Even after sheriff's deputies arrived, Harvey could still hear defendant hitting McKinney. McKinney lost consciousness during the beating after defendant kicked her in the face. When deputies found McKinney in the bathroom, her lips were swollen and bleeding, her eyes were swollen shut, her face was bloody, and she was crying. Although McKinney later recanted her statements to deputies and the social worker, her original statements were corroborated by Harvey and investigating deputies.

Defendant described McKinney as being so drunk that she repeatedly fell at the party, just outside their home, and multiple times in the home. According to defendant, McKinney kept falling down in the bathroom, repeatedly hitting herself on bathroom fixtures. Defendant's explanation of events was not credible. If the trial court erred in allowing the uncharged crime into evidence, the evidence was harmless under the Watson standard of review. Defendant has failed to establish the error, if any, was so prejudicial as to rise to the level of federal constitutional error or a denial of due process.

Maine, 2017 WL 1034683, at *5–9.

    a.  Legal Standard and Analysis

Petitioner cannot show that the admission of evidence concerning the 2009 assault of Juan Rocha was contrary to or an unreasonable application of Supreme Court precedent. There is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In Holley v. Yarborough, the Ninth Circuit stated:

Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating

discretionary decisions to exclude the kind of evidence at issue here"); see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such conclusions. Brown, therefore, cannot – as the petition in Moses could not – show that the state appellate court's ruling was either contrary to or an unreasonable application of clearly established Supreme Court precedent."). Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed. Id.

Petitioner also fails to show that the state court determination of harmless error was unreasonable. The jury was instructed with CALCRIM No. 303 which informed the jury that evidence that is admitted for a limited purpose may not be considered for any other purpose but the limited purpose. The jury was also instructed with CALCRIM No. 375 which informed the jury that the prosecution had to prove the uncharged act by a preponderance of the evidence. In addition, it instructed the jury that the other crimes evidence could only be used to compare its similarity, or lack thereof, with the charged offense, and for no other purpose. "A jury is presumed to follow it instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). Petitioner thus fails to show that any error had a "substantial or injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). The claim is without merit and should be denied.

    5.  Prosecutorial Misconduct

Petitioner alleges that the prosecutor committed misconduct in closing argument by referencing a quote from philosopher Eric Fromm, and this quote constituted new evidence in violation of his constitutional rights. In the last reasoned decision, the state appellate court denied the claim as follows:

**Issues**

Defendant contends the trial court erred in failing to grant his motion for a mistrial for alleged prosecutorial misconduct. Defendant contends that during oral argument the prosecutor quoted a provocative passage from Erich Fromm about

23

the relationship between a sadist and his victim. Defendant argues the quote seriously undermined his case and unduly prejudiced him. The People argue the issue is forfeited and, if not, it did not constitute error. We do not find forfeiture or error.

**Background**

During her closing argument, the prosecutor included a slide displayed to the jury with the following quote from the philosopher Erich Fromm:

> "'The sadistic person is as dependent on the submissive person as the latter is on the former; neither can live without the other. The difference is only that the sadistic person commands, exploits, hurts, humiliates, and that the masochistic person is commanded, exploited, hurt, humiliated. This is a considerable difference in a realistic sense; in a deeper emotional sense, the difference is not so great as that which they both have in common: fusion without integrity.'"

As the prosecutor displayed this slide, she argued to the jury: "This is not the law. It's just an idea. But that both perpetrator, the sadistic person, and the person who is the submissive person, they have a connection, and one depends on the other." Defense counsel immediately objected to the quote, arguing it misstated the law and constituted evidence outside of the trial. After a sidebar with counsel, the trial court instructed the jury with the following:

> "Ladies and gentlemen, please disregard—of course, this slide, ... disregard the previous quote from Dr. Fromm. As I understand, it's only being used for illustrative purposes. It does not state the law. The law will be read to you in the form of jury instructions, which you have the right, should you so request, to have them brought back into the jury room for you to peruse and/or you can request explanation regarding any jury instruction through your foreperson to the Court, and then we'll discuss the notes with counsel and then respond to you appropriately. But disregard it. Counsel may use it for illustrative purposes only."

The prosecutor proceeded with her argument, reiterating that the quote was not the law. The prosecutor argued a sadistic person is "commanding, exploiting, hurting, and humiliating another person, but that the other person is then humiliated, exploited, hurt, and commanded. And that although they're extremely different, there's still an issue there." The prosecutor pointed out McKinney was in the position of being commanded, exploited, and manipulated by defendant, and McKinney allowed this to happen. The prosecutor further argued the People have a duty to prosecute crimes like those charged against defendant because the People have a duty to protect those who cannot protect themselves. The prosecutor finished this line of argument by noting the jurors had to consider the evidence before them even though McKinney did not want the prosecution to go forward.

Prior to his own closing argument, defense counsel then brought a motion for mistrial based on the prosecutor's posting of the slide and her argument concerning the quote from Erich Fromm. Defense counsel represented to the court that the slide was shown to the jury for 30 seconds and defined sadism in a way that did not comport with California law. Defense counsel described the quote as an extrajudicial piece of evidence. Defense counsel argued the bell had been rung, it could not be unrung, and if the mistrial motion was denied, he would have to comment on who Erich Fromm was. Defense counsel described Fromm as a

notorious person, a staunch anti-American communist who fled this country, and because of this, defendant's due process right to a fair trial was violated.

The prosecutor replied the purpose of the quote was to illustrate the submissiveness of one person to another, to show the connectedness of McKinney to defendant, and to show why she testified the way she did. She pointed out the slide was taken down immediately. The court could not remember if it admonished the jury to disregard the quote. The prosecutor stated the court did so. Defense counsel stated he did not want to re-ring the bell. The court found the prosecutor did not violate the law and denied defendant's motion for a mistrial.

In his closing argument to the jury, defense counsel explained Erich Fromm was born in Germany in 1900. He was Jewish and fled the Nazis, going to Geneva and then America. Fromm was a philosopher who published books that audaciously criticized our country, stating its nationalism was a form of incest, idolatry, and insanity. Defense counsel argued Fromm dedicated that book to Karl Marx, the founder of communism. Fromm left this country and lived in Mexico until his death.

## Forfeiture

The People argue defendant forfeited his assertion of prosecutorial misconduct because his defense counsel did not object to the slide of the Erich Fromm quote on this specific ground. Defense counsel argued instead the slide misstated the law and was evidence outside of the trial. In his reply brief, however, defendant accurately points out that a prosecutor who states a fact not in evidence to the jury during argument commits misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 212–213.) Because defense counsel's objection included a ground for prosecutorial misconduct, we reject the People's argument this issue was forfeited for appellate review.

## Analysis

A prosecutor commits misconduct if he or she misstates the evidence. (*People v. Davis* (2005) 36 Cal.4th 510, 550.) Prosecutors otherwise have wide latitude to draw inferences from the evidence presented at trial. They can vigorously present the facts favorable to the People's case unless they misstate the evidence or refer to facts not in evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 823, 827–828.) A prosecutor's misconduct must be so egregious it infects the trial with such unfairness as to constitute a denial of due process before it violates the Fourteenth Amendment to the federal Constitution. (*Donnelley v. DeChristoforo* (1974) 416 U.S. 637, 643; *People v. Hill, supra,* at p. 819.)

A prosecutor may, however, state matters not in evidence that are common knowledge, or illustrations drawn from common experience, history, or literature. The prosecutor has broad discretion to state the People's views regarding which reasonable inferences may or may not be drawn from the evidence. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026; *People v. Hill, supra,* 17 Cal.4th at p. 819.) A prosecutor may vigorously argue his or her case and is not limited to Chesterfieldian politeness; appropriate epithets may be used. (*People v. Hill, supra,* at p. 819.)

We conclude the prosecutor did not misstate evidence or refer to facts not in evidence when she referred to the slide quoting Erich Fromm. The prosecutor told the jury the quote was not the law, it was just an idea, and she explained how a

sadistic perpetrator and a victim depend on each other. The prosecutor referred to the dependency a victim can have with an abuser to ultimately explain why in her testimony McKinney recanted her earlier statements to the social worker and sheriff's deputies concerning the details of defendant's abuse of her on New Year's Day.

The prosecutor's reference to the quote was a literary way to refer back to the expert testimony of Nada Yorke concerning the common relationship characteristics shared by abusers and victims of domestic violence. Yorke explained why victims of domestic violence recant their report of abuse once the matter reaches the judicial system. It was in the context of how McKinney changed her story that the prosecutor referred to the Erich Fromm quote. This reference to literature was a traditional and acceptable argument for a prosecutor to make. It was not evidence outside the record as defendant argues on appeal. There was nothing reprehensible about the prosecutor's reference to the quote. We further note the quote was before the jury, by defense counsel's reckoning, only 30 seconds.

The trial court also advised the jury the quote was not the law and to disregard it. The jury was instructed with CALCRIM No. 222 that the closing arguments of counsel are not evidence. As noted above, the jury is presumed to understand and follow the trial court's instructions. (*People v. Sanchez, supra*, 26 Cal.4th at p. 852; *People v. Holt, supra*, 15 Cal.4th at p. 662; *People v. Hernandez, supra*, 181 Cal.App.4th at p. 1502.) Defense counsel elected to refer to the Erich Fromm quote by launching into an attack on Fromm's character, questioning his politics, patriotism, and loyalty to America. In doing so, defense counsel successfully undermined Fromm's effectiveness as a social observer.

When reviewing a trial court's ruling on a motion for new trial, appellate courts apply the deferential abuse of discretion standard. (*People v. Howard* (2010) 51 Cal.4th 15, 42–43.) Defendant had failed to demonstrate the prosecutor's conduct was egregious or constituted misconduct. The trial court did not abuse its discretion in denying defendant's motion.

Maine, 2017 WL 1034683, at *9–12.

    a.  <u>Legal Standard</u>

To merit habeas relief for allegations of prosecutorial misconduct, "it is not enough that" the petitioner demonstrates that the prosecutor's "remarks were undesirable or even universally condemned," <u>Darden v. Wainwright</u>, 477 U.S. 168, 181; a petitioner must demonstrate that the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>Greer v. Miller</u>, 485 U.S. 756, 765 (1987) (quoting <u>United States v. Bagley</u>, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. <u>Id.</u> at 765-66; <u>United States v.</u>

Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

    b. Analysis

    In this case, the state appellate court determined that there was nothing improper or reprehensible about the prosecutor's literary reference. The court noted that the prosecutor did not misstate the evidence or refer to facts not in evidence. The court further noted that the prosecutor suggested the quote as merely an idea, but not law. The court also found that the reference to literature was a traditional and acceptable argument for a prosecutor to make. The appellate court's determination was not unreasonable.

    Even if the literary reference could be considered undesirable or universally condemned, it certainly did not rise to the level of a constitutional violation. The slide was before the jury for no more than thirty seconds. The trial court instructed the jury that it was not evidence and to disregard it. And, the jury was instructed that nothing counsel said in closing was evidence, and they were only to consider the evidence presented during trial. The jury is presumed to follow its instructions, and in this case, there is no indication the jury failed to do so.

    From the record, a fairminded jurist could conclude that the prosecutor's literary reference could not reasonably be seen as "infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. The claim should be denied.

    6. Cumulative Error

    Petitioner alleges the cumulative effect of the alleged errors deprived him of a fair trial in violation of his due process rights. The state appellate court denied the claim as follows:

27

Where, as here, nearly all of defendant's assignments of error are rejected, there is no cumulative error. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1056; *People v. Bradford* (1997) 15 Cal.4th 1229, 1382; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Defendant has failed to show cumulative error.

Maine, 2017 WL 1034683, at *12.

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). In this case, no constitutional errors occurred, and hence, there can be no cumulative error. Even if errors occurred, a reasonable factfinder could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

7. *In Camera* Review of Confidential State Records

In his final claim for relief, Petitioner alleges that he is entitled to another *in camera* inspection of the confidential state record for possible disclosure of evidence material to the defense. In the last reasoned decision, the state appellate court rejected the claim as follows:

> *Pitchess* motions are the procedure by which defendants can screen law enforcement personnel files for evidence that may be relevant to their defense without compromising the officer's reasonable expectation of privacy in those records. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225.) Subject to various restrictions not relevant here, a trial court must conduct an in camera review of potentially relevant personnel files if the defendant makes a showing of good cause for the discovery. (*Id*. at p. 1226.)
>
> This process is effectuated by having a custodian of records collect all potentially relevant documents from identified personnel files and present them to the trial court. The custodian "should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*People v. Mooc*, supra, 26 Cal.4th at p. 1229.)
>
> The trial court must then make a record of what documents it has examined to permit future appellate review. (*People v. Mooc, supra*, 26 Cal.4th at p. 1229.) "If the documents produced by the custodian are not voluminous, the court can photocopy them and place them in a confidential file. Alternatively, the court can prepare a list of the documents it considered, or simply state for the record what

documents it examined." (*Ibid.*) These proceedings are then sealed. (*Ibid.*) On appeal, we independently examine the record made by the trial court "to determine whether the trial court abused its discretion in denying a defendant's motion for disclosure of police personnel records." (*People v. Prince* (2007) 40 Cal.4th 1179, 1285.)

The trial court complied with the required *Pitchess* procedures. The custodian of records was present and placed under oath. Potentially relevant documents were reviewed and considered in light of defendant's discovery motion. The court created an accounting of what was reviewed and why it was not relevant or subject to production. And these proceedings were stenographically recorded. (*People v. Mooc, supra*, 26 Cal.4th at p. 1229.) Our review of the relevant personnel information of sheriff's deputies Eric Hughes and John Puga revealed no discoverable information.

Maine, 2017 WL 1034683, at *12.

a. Legal Standard and Analysis

Petitioner's claim fails for a number of reasons. To begin, a request for *in camera* review of state court discovery proceedings is not cognizable on federal habeas review. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991); see also 28 U.S.C. § 2254(a). Accordingly, the Court may not grant habeas relief based on an alleged error in the interpretation or application of state law. Estelle, 502 U.S. at 68; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991); Dugger v. Adams, 489 U.S. 401, 409 (1989). Thus, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. Drayden v. White, 232 F.3d 704, 710 (9th Cir.2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir.1999); Jammal, 926 F.2d at 919.

In this case, the California Court of Appeal addressed Petitioner's request to review the police personnel records and found no reversible error with regard to disclosure of the records. The appellate court noted that the trial court's procedure complied with the required Pitchess procedures. In his petition, Petitioner does not raise a constitutional challenge to the trial court's discovery ruling; he merely requests that this Court also conduct its own independent review of the sealed transcript relevant to the closed hearing held in response to the discovery motion. (Doc. 1 at 14.) Petitioner thus fails to raise a cognizable federal habeas claim, and it should be

29

1    dismissed.

2          To the extent Petitioner's request suggests the trial court's failure to allow disclosure of

3    the personnel records denied him access to favorable evidence material to his guilt, Petitioner's

4    claim also fails.  The Due Process Clause requires the government to produce to criminal

5    defendants favorable evidence material to their guilt or punishment.  <u>Brady v. Maryland</u>, 373 U.S.

6    83, 87 (1963). The prosecution has a duty to produce such evidence even if the defense has not

7    requested it.  <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1975).  Evidence is material under <u>Brady</u>

8    "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result

9    of the proceeding would have been different."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995)

10   (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).  "There are three components of a

11   true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is

12   exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

13   either willfully or inadvertently; and prejudice must have ensued."  <u>Strickler v. Greene</u>, 527 U.S.

14   263, 281-82 (1999). An essential element of a <u>Brady</u> claim is prejudice.  <u>Id</u>. at 282.

15         The <u>Pitchess</u> procedures in California operate in parallel with <u>Brady</u>.  <u>See</u> <u>City of Los</u>

16   <u>Angeles v. Superior Court</u>, 29 Cal.4th 1, 14 (2002) (quoting <u>People v. Mooc</u>, 26 Cal.4th 1216,

17   1225 (2001)) ("[T]he Pitchess 'procedural mechanism' for criminal defense discovery ... must be

18   viewed against the larger background of the prosecution's constitutional obligation to disclose to a

19   defendant material exculpatory evidence so as not to infringe the defendant's right to a fair

20   trial."); <u>see</u> <u>Harrison v. Lock</u>yer, 316 F.3d 1063, 1066 (9th Cir. 2003) ("We are not instructed on

21   how a defendant in a criminal case will know, or be able to make, a preliminary showing that a

22   police personnel file contains evidence material to his defense. But we are clear that the

23   California Supreme Court has faithfully followed the United States Supreme Court."). The

24   <u>Pitchess</u> procedures require the defendant to make a preliminary showing of materiality to the

25   pending action before the trial court conducts an *in camera* review of the documents at issue. <u>See</u>

26   <u>Harrison</u>, 316 F.3d at 1066; <u>City of Los Angeles</u>, 29 Cal.4th at 15.

27         Here, the trial court conducted an *in camera* review of the personnel records of Officers

28   Hughes and Puga.  After carefully reviewing and creating an accounting of what was reviewed

and why it was not relevant, the court denied the discovery motion.  The California Court of Appeal subsequently reviewed the personnel records and found no reversible error.  Each state court that reviewed the personnel records essentially found nothing relevant to the defense.

Further, Petitioner makes no showing of any failure to disclose material evidence under Brady.  Petitioner's mere speculation that the personnel records contained evidence favorable to the defense is insufficient to establish a due process violation under Brady.  Harrison, 316 F.3d at 1066 (due process not violated where petitioner made no showing that police officer's file contained complaints material to defense); United States v. Agurs, 427 U.S. 97, 109-110 (1976) (Petitioner fails to establish materiality or relevance because his claim is based ... on his bald assertion that the undisclosed records may have shown that there may have been complaints against [the] Officer [ ], and that those possible complaints in turn may have had some impeachment value for the defense."); United States v. Michaels, 796 F.2d 1112, 1116 (9th Cir. 1986) ("'mere speculation about material in the government's files [does not require] the district court or this court under Brady to make the materials available for [the appellant's] inspection.' Nor does Brady 'require the trial court to make an in camera search of the government files for evidence favorable to the accused.'" (citations omitted)).

Moreover, Petitioner was not prejudiced by the trial court's decision not to order disclosure of the officers' personnel records.  A trial error is not grounds for granting a habeas petition unless it had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Accordingly, in order to prevail, a habeas petitioner must show that the error of which he complains resulted in "actual prejudice."  Id.  In this case, the California Court of Appeal reviewed the personnel records filed under seal, and found no reversible error by the trial court.  In light of this determination by the appellate court, following its review of the officers' personnel records, Petitioner's mere speculation that the disclosure of the personnel records would have had an effect on the jury's verdict is insufficient to establish actual prejudice under Brecht.  Based on the foregoing, the state courts' decisions were not contrary to, nor involved an unreasonable application of, clearly established federal law, as

31

determined by the United States Supreme Court. <u>See</u> 28 U.S.C. § 2254(d).

**IV.     RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **January 31, 2018**                           **/s/ Jennifer L. Thurston**
                                                UNITED STATES MAGISTRATE JUDGE